Good morning. The first case on the panel's list for oral argument this morning is in Re Lemington Home for the aged. Mr. Bow? Bowie, Your Honor. Bowie? Bowie. I'm sorry. Your Honor, was it Casey Stengel that said this is déjà vu all over again? For me it is. Yes, it is. Your Honor, I'd like to reserve five minutes of my time for rebuttal. If it pleases the court, my name is Michael Bowie from Kasich, Benson, Torres & Friedman in New York. I'm appearing on behalf of the defendant appellants, all of whom are former officers and voluntary directors at Re Lemington Home for the Aged. I'm here to argue that the judgment and verdict below should be reversed and judgment should be entered in favor of the defendants because of fundamental failures of proof by the plaintiffs for every one of their claims, including the failure to present proof that fraudulent or intentional harm caused the damages they're claiming or that they suffered the actual damages they're claiming. Re Lemington Home for the Aged served the elderly for 122 years before being closed in 2005. At trial, plaintiffs presented evidence that in the last decade, particularly in the last few years, the home suffered increasingly severe operational and financial problems. It was running an enormous financial deficit. It was having problems maintaining records. It was having problems billing and chasing receivables. And most importantly, it was having problems with patient care. The evidence also at trial showed, however, that these were not intentional, malicious, fraudulent acts by anyone at the home. The overwhelming evidence, including from the plaintiff's own experts and witnesses, was that these were the byproduct of a failing, collapsing institution, not the elements of fraud or malicious action. How do you reconcile that with the findings of the individual who did a review in June of 2005 who recounted the status of the recordkeeping or the lack of it or the other reports that indicated a lack of cooperation by the CEO or CFO, Mr. Sheely? How do you reconcile those findings with what you just said? Your Honor, to simply put, any institution that is collapsing, if you don't have resources and you don't have the skilled people there, you can't do the job. Well, isn't it the Board's responsibility then to make sure the right people are intact and doesn't match to a failing on the part of the Board? Ultimately, Judge, it is the Board's responsibility to manage the company, not manage the company but oversee the strategic vision of the company. But the question we have here is, was the Board's decision here malicious, intentional, fraudulent, or any of those things? Well, what about the breach of the duty of care? I mean, the directors have a fiduciary obligation, and so the jury not only found there to have been a deepening insolvency established, but also that they had breached their duty of care. Well, Your Honor, in this instance, under these bylaws, the duty of care... For the directors was reckless conduct, right? Well, no, Your Honor, we would disagree. With respect to the directors, the duty of care would require that they take steps that are prudent, and there is a difference between steps that are prudent for patients. A patient might have a claim, I would agree with that. Well, one of the problems here is that the state law required that there be a full-time administrator at the nursing home, and Ms. Kazi was not full-time. Toward the end, she was not, Your Honor, but there's no evidence, again, with respect to all of these issues, the hodgepodge of misconduct and mismanagement... Was it towards the end that you had the patient deaths? Exactly, Your Honor. So it's toward the end where this institution is falling apart, and one can certainly look at... And it doesn't have a full-time administrator, and the directors, or at least some of the directors, knew she wasn't full-time. Directors are aware that she's not full-time, and then things begin to deteriorate. Patients die, and then a decision... The state comes in, and the state says, you can no longer accept any new patients, and the CEO has to go. And we all agree that was appropriate. Plaintiffs' experts agree, and we agree. The home needed to be closed. Now, it could be, and it probably is, that one could say the directors possibly should have done that sooner. They should have closed that sooner. And I think with respect to patients, that's one issue. But with respect to the issues we're dealing with here, in a bankruptcy context, in a creditor context, it's something very different. Because what we need is harm to the company and the creditors as a result of some malicious or intentional act by the directors or the officers, and there's simply none here. Well, what about the fact that they weren't collecting the payments from the government entities? And what about the tax assessment that they were entitled to and didn't disclose they were getting another million plus? Why hasn't all of that taken together enough to show that there was an effort to deplete the value of this entity so, in fact, it would close and therefore not take care of those assets of the debtor? Your Honor, there has to be. I think you're correct. There has to be some evidence that that was their intent, that their intent was to close this entity. So as the plaintiff's original theory was, as your last opinion on summary judgment said, and as they repeat in their appellate brief, their theory to prove malicious intent to defraud was that there was a secretive decision to cease taking new patients, effectively destroying the ability of the home to obtain revenue while it continued to accrue debt for normal operations. But the evidence was the opposite. The evidence was these directors were struggling to keep the mission of this charity that had been around for 122 years alive. In fact, the fault now is that they should have closed it sooner. But the claim by the plaintiffs is that they were harmed by a fraudulent nondisclosure that happened in January 2005 where the directors, according to the plaintiffs, made a malicious decision, a wrong decision, to close the facility after being told by regulators they couldn't take any more customers. So the claim here isn't that they left it open too long, Your Honors. The claim here is that they closed it too soon. Now, isn't the claim here that they made a decision to close in January but continued to string along creditors until April, until they filed for bankruptcy? Well, Judge, the claim here is that they made a decision to cease taking patients. I thought the claim was that they decided that they would file for bankruptcy in January, decided to keep that secret while they continued to string along creditors. Maybe the appellee will disabuse me of that notion. Well, I think, Judge, Your Honors, the record shows at trial was that the state came in and said you can no longer take in new patients, which effectively, according to the plaintiffs, experts, and the defendants, that meant you had to close. So the question then was how to do that. Let's go back to the other question. The jury also found liability on this breach of fiduciary obligations, the officer's duty of care. Shealy doesn't bill for Medicare patients, right, over $500,000? That's correct, Your Honor. And what the evidence showed there wasn't that he wasn't interested in that or didn't care about that or intentionally avoided it or was siphoning money, which is what is required. It was that he didn't have the coders. He didn't have the coders to do it. He didn't have the people to interface with Medicare. And that information was provided to the directors? The record on that is in dispute. So, Your Honor, I think you would find that it was. But with respect to Shealy and Causey, they are sitting there on a ship, correct, that is troubled. They can only do what they can do what they have. And when a consultant comes in, Shealy locks himself in his office? Well, Your Honor, that was after? Regardless of when it was, Shealy was completely uncooperative and locked himself in his office or closed himself off in his office. Isn't that correct? There's no doubt, Your Honor. This is the classic case. We've both asked a pretty specific, pretty direct question, which is susceptible to a yes or no answer. I'm sorry, Your Honor. What the question is that I didn't answer? I thought it was fairly plain that Shealy locked himself in his office or closed himself off in his office and did not cooperate with those who were visiting. That is correct, Your Honor. But in this case, there is a plethora of bad facts. There is no question. There are two people who died. But the question is where from the conduct has to flow causation, has to flow damages? Let me shift ground here because the clock is running and you have raised a punitive damages issue, which I think allows us, with your comment about bad facts, to transition cleanly to punitives. And my understanding of your position and my understanding of the underlying procedure here is this, that you have indicated that there was no evidence adduced at the time of trial of the defendant's ability to pay. Is that correct? That is correct, Your Honor. And my understanding is, although I do not have the record in front of me of either substantial appendix, that the district court, in instructing the jury on the punitives, indicated to them that they could consider the ability of defendants to pay. Am I right? Does that appear somewhere in the appendix? I believe that is correct, Your Honor. If you or your adversary have it, I would like to have a reference to it. But, I mean, this is, I guess, kind of a softball to you, but what is the jury supposed to do with an instruction when, as you have pointed out, there is no evidence offered as to the defendant's will? Judge, the jury can't do anything but speculate, which is consistent with the problem they have with respect to all of the damages, Your Honor. It's not just punitives. Let's stick to my question. My question is the punitives, because this is a discrete problem, a discrete issue, that arises under Pennsylvania law. There is not a lot of law on punitives. We've adopted in Pennsylvania the restatement position, which says that the fine group fact in assessing punitive damages may consider the wealth of defendant. But if the record is, as I understand it, as you maintain, there is nothing about the wealth of defendant, notwithstanding the fact that there is an instruction. And while you don't explicitly argue it, you repeatedly argue the lack of evidence issue, doesn't that leave the jury with a situation where they have to speculate? It absolutely does. I obviously want to follow up with your adversary on that later. But, all right, you have reserved five minutes for rebuttal. We've gone well beyond your time at this point. We'll have you back, Mr. Bowie. Then, Mr. Kralik? Kralik, Your Honor. Good morning, Your Honors. Nicholas Kralik. I am representing the Official Committee of Unsecured Creditors of Lonington Home for the Aging. As the Court sees from the record in this matter, we are back before this Court for the third time. This Court found when it reversed the District Court's grand summary judgment that there was sufficient evidence in the record to submit to a jury to make reasonable inferences from the evidence that could find that there was a deepening insolvency caused by the fraudulent expansion of corporate debt, and there was a breach of fiduciary duty by the officers and directors. Brought back to the trial court, and after a six-day trial, and after three days of deliberation by a very deliberative jury, they came back with a verdict in favor of the plaintiff. How do you explain the difference in treatment among the different defendants, the directors and officers? Some were found liable, some weren't found liable, some were awarded, required to pay punitive damages. What I can explain to you, Your Honor, is that the jury had access to a joint exhibit. I think it was J.A. Wentz in the record as to, at least insofar as the directors are concerned, which directors were involved in what meetings. And I think you will find, if you review that record, that in the most critical points of time when the decision was made to close the home, to deplete the census, to not disclose the $1.4 million influx, all five of the defendants that were named, the director defendants, excuse me, that were identified as punitive damage recipients, Mr. Baldwin, Ms. Andiorio, Mr. Bullock, Ms. Johnson, Mr. Tompkins, were, in the view of the jury, based upon their review of the evidence, found the most culpable, as opposed to the other directors who were not assessed with punitive damages. As indicated from the questions about Mr. Sheely and Ms. Causey and the awarding of punitive damages against them, I think the record is clear that they clearly breached their fiduciary duties, not performing even the most fundamental duties of their respective positions. Not only that, Ms. Causey, who held a dual role of CEO and nurse-at-home administrator in violation of state law, pretty much neglected the nurse-at-home administrator aspect of it. If we're focusing on the directors and the punitive damages awarded against them, where in the record would tell us when they were on notice of the various problems that you've just described at the facility, or that the record reflects were at the facility? Were they on notice real time? Are they being reported to them much later? For example, when did they learn that there had not been requests for the Medicaid reimbursements? They were aware of that. I believe the record shows through the testimony of Mr. Baldwin in late 2004. In terms of when they participated in the board meetings where the critical decisions were made on the subject of this case, I think there's a joint exhibit, J1, that shows when those meetings were held and who was present among the directors with regard to those meetings. What is the nature of the claim? Are you contending that the directors allowed this facility to remain open too long, or are you saying that the directors in January should have charted a course that would have allowed the facility to have been sold to another suitor? Well, I think a combination of both, Your Honor. Let me explain. From January 2005 on to the bankruptcy filing is when the most noteworthy conduct occurred. But that's not the narrow window within which the insolvency was deepened. I think the party stipulated in the record that the home was insolvent as of 2003, and there continued to be problems going forward in terms of not even billing for Medicare and Medicaid or not even billing other third-party payors. So they were recklessly indifferent to the proper operation of the home. The continuing decline of the home, I think the Board knew, and the record will show, knew as far back as 2001 that they had problems with Ms. Causey occupying both the position of CEO and nursing home administrator, and the recommendation was that you need a seasoned, licensed, full-time nursing home administrator to sustain this operation. They were aware of that. They took no action to replace her. They got a grant to find somebody to replace her. They got a grant from the Pittsburgh Foundation for the express purpose, and rather than risk her position and perhaps an adjustment to her own salary, she used the grant for other purposes and didn't hire a nursing home administrator. So the combination of factors there, they shouldn't have taken some action after January 2005. And the proof, Your Honors, is in the pudding, because after January 2005 when they made the decision to close the home and started depleting the census further because they wanted to kill the home, they hired another administrator, a full-time administrator, after they terminated Ms. Causey. I think the record showed Elizabeth Garrett was hired in early March. There were deficiencies identified from a health department inspection in December of 2004, which when Ms. Garrett was brought on board in March of 2005, she cleared out the deficiencies. You add that fact with the fact they hadn't been billing, not even billing for Medicare, Medicaid, and third-party payorts to the tune of almost combined $1.2 million, and add that fact, the influx of $1.4 million in May, which was not disclosed to the creditors. Would you address, Judge, this question? Wasn't the failure to submit evidence of defendants' personal wealth problematic insofar as an award of punitive damages is concerned? It's not problematic, Your Honor, because I think we point out in our brief, and as Judge Schwab pointed out in his opinion, the wealth of the defendants is a factor that may be considered, not shall be considered. That's not the question. I didn't ask you about a legal error in any requirement. You're absolutely right. That's what the restatement of torts as adopted by the Pennsylvania Supreme Court says in Feller v. Merriam. The question is, what is the jury to do when confronted with an instruction that tells them that they may consider this, and there is absolutely zilch in the way of evidence in the record and before them on the question of wealth of the defendants? Well, obviously, Your Honor, they didn't consider wealth if it wasn't of record. There was an attempt to put it in after the trial. You don't think that's a confusing instruction? You don't think also that the court reversed the burden of proof here, as you have done in your brief, suggesting that the defendants could have offered this evidence? The burden of proof in making out a punitive damages claim is on you, right? It's your claim. Correct, Your Honor, but also among the elements that can be shown in establishing punitive damages was the nature of the conduct of the defendants against whom punitive damages were awarded. And you showed that through your evidence throughout the case, and you argued that considerably in the red brief in response to the contention that punitive damages here were not proper because there was no evidence. And again, I don't have the large appendix in front of me right now. I had it back in my chambers 100 miles from here. But isn't the defendant correct that the committee never introduced evidence of the wealth of any of the defendants? There is no evidence of record of the wealth of the defendants. That is correct, Your Honor. And isn't it also true that three of the five directors, and my questions here really are directed mostly to the director defendants, not the officer defendants. Three of the five directors against whom punitive damages were imposed were never even mentioned by a single witness during trial? Well, and this was addressed in the judge's opinion. It was addressed in our brief. Yes, they were not mentioned during the trial, but their names appeared throughout the exhibits in terms of the meeting minutes, what they participated in in terms of the various director meetings, what decisions were made. And I think the record also shows that they received more correspondence about the closure of the home than other directors who were not assessed with punitive damages. Their names appeared in exhibits. That is your case as to outrageousness with respect to those three or five directors? Not in isolation. Their names appeared in exhibits in terms of the meetings that they participated in, the decisions that they participated in, what influences the jury brought from those decisions and the conduct that they found them liable for. Yes, they were mentioned in exhibits. You're asking us to go back and look at these exhibits, and we will. And we'll see about Defendants Bullock, Johnson, and Tompkins. And what if there are others also who were equally present at those meetings against whom punitive damages were not assessed? How are we to determine what basis the jury had for deciding that they acted with sufficient culpability to warrant punitive damages? Well, the jury apparently decided that they didn't act with sufficient What's the basis for distinction? Let's say we have ten defendants, because five is not a quorum. There had to be more director defendants at a meeting than these five against whom punitive damages were awarded. So how are we to decide? Why are these five being singled out, or these three at least, that can see a basis for Baldwin and D'Orio, but the other three, Bullock, Tompkins, and Johnson, how are we to distinguish them from the other director defendants? Well, Bullock was one of the ones that was involved in preparing the bankruptcy schedules and didn't disclose the existence of the potential influx of $1.4 million. I believe it was Ms. Johnson who made the motion at the January 5th meeting to close the home. I'm not sure what the significance of a quorum is. I think that was addressed in the trial court's opinion, and it was determined that the lack of the quorum in terms of the number of directors who were assessed with punitive damage was relative on the issue of punitive damages. It was based on what the jury would infer from the record before it as to which defendant directors were the most culpable for the actions of which they found malign. And where from the record would we know that Ms. Bullock, when she signed these schedules, knew then that this influx was coming, that $1.4 million was coming? I saw a stipulation representing the home was due this money, but where in the record would you tell me she was on notice, or the board was on notice, this money was coming, but at the time the bankruptcy petition was signed it was omitted? I believe the stipulation is what we would be relying on. Okay, thank you. I wanted to address a few things in the limited amount of time I have left, and that was dealing with the elements of proof and common law fraud and what the directors and the officers claimed was not proven by the committee. This court's standard for fraud was identified in the Baldwin decision back in 2011 in the context of deepening insolvency, in the sense of fraud can be anything that is calculated to deceive, it can be suppression of truth by silence, and that's what we submit occurred in this situation. With regard to another argument that was made by the defendant directors and officers regarding the infection of the verdict, they are going from the premise that the deepening insolvency count should be dismissed, and therefore because that one should be dismissed there's no way to farm out or figure out how the damages were assessed by the jury on these various counts. I invite the court's attention to the fact that in the record there was an instruction and a jury interrogatory provided that the defendants did not object to, that provided for a single lump sum award for all damages as to all claims. Defendants cite a couple of cases in their brief involving sexual discrimination which involved multiple counts, just like this case involved multiple counts, but unlike this case those other cases they cited were distinguishable in the sense that those sexual discrimination cases involved discrete instances of types of misconduct with different proofs and different levels of damages. They did not object to the jury interrogatory providing for the lump sum of the one verdict. In fact, I believe they proposed it. There is also a case that I found in our research addressing that particular issue regarding the jury interrogatory and the claim of damages, and I believe that might sound familiar to His Honor Judge Vanaski because that was a case involving sexual discrimination action as well. It was Hall versus the Commonwealth of Pennsylvania Department of Corrections. It was when the judge was on the Middle District of Pennsylvania. That case involved three separate claims of failure to promote hostile work environment and retaliation. Special verdict questions addressed the separate claims and separate interrogatories. It sounds very familiar. If the jury found the department liable on only one of the three claims, or any of the three claims, they go to a fourth interrogatory which called for one damage award for all claims in which liability was found. Now, in that case, the Department of Corrections argued that submission of a dismissed retaliation claim to the jury infected the hostile work environment verdict. In this situation, the directors and officers are saying, well, the deepening insolvency claim should be dismissed, and therefore, if that's dismissed, that infects the entire verdict. That's not the case. Number one, they didn't object to that jury interrogatory, and as Honor Judge Vannaschi held in the Hall case, the defendant's argument that the retaliation claim's prejudicial effect is most acute on the issue of damages is hard to fathom, given the defendant's failure to object to the special verdict questions submitted to the jury. Now, in this case, the directors and officers' argument that the deepening insolvency claim has a prejudicial effect on the issue of damages on the breach of fiduciary duty, I would submit is similarly hard to fathom. Of course, in the Hall, I granted a substantial remitter, as I recall. You granted a substantial remitter for a number of other reasons unrelated to what we're dealing with here. But you did do that, Your Honor. That's correct. And, Your Honor, I submit there was sufficient evidence to support the jury's verdict, and I ask that the jury verdict and Judge Schwab's order tonight in post-trial motions be affirmed. Thank you. Thank you. Mr. Bowen, rebuttal. Thank you, Your Honor. Your Honor, with respect to punitive damages, you asked the appropriate question. When a jury is told they can consider something or award something and they're not given the evidence, what are they to do but speculate? Counsel's explanation that the company was insolvent after the alleged nondisclosure in January but was also insolvent some other time in the past points out our main issue on appeal, which is accepting all of the plaintiff's characterizations of the bad conduct, they still have the burden of proving that bad conduct caused the economic injuries that they're claiming. And on that, there is no proof presented to the jury. There was no proof, none, presented on the issue of deepening insolvency. But the census drops, Medicaid monies aren't coming in. How does that not show a deepening on the insolvency? If we assume insolvency was as early as was been represented in 2001, how does this conduct not continue to slide downward at the hands of the officers and directors? Your Honor, the question is deepening insolvency doesn't just mean you're losing money. It depends on what your balance sheet is. You can lose revenue and become less insolvent. So what is required is you need to have somebody who says, I did an insolvency analysis before the bad conduct. I did an insolvency analysis after the bad conduct. And the analysis there is as follows. Here, there was none of that ever. So for all we know, there was a nominal increase in the insolvency from the time, as counsel pointed out, it may have always been insolvent. And there may have been a nominal amount of insolvency change from January to the bankruptcy. We have no idea that they were permitted to present to the jury evidence of deepening insolvency damages of $7 million. Well, that comes from the claims made, right? That was the claims in the bankruptcy? No, Judge. There were two elements. There were claims made, and then there was the going concern. But again, on going concern, they didn't do an analysis of this company. So a going concern analysis, you would come and say, okay, this is what the going concern value was on whatever date they say the bad conduct, before the bad conduct occurred. And then you would say, here's the going concern analysis at the end, and you would get the delta. Would you address the point made by your adversary with respect to the fact that the jury found liability not only on deepening insolvency but also on breach of fiduciary duty of care, and you agreed to the submission to the jury of a single damage verdict? In other words, let's say we agree with you on deepening insolvency, but we find ample evidence of breach of the duty of care. Does that mean we have to send it back for a new trial on damages? It is, Your Honor. Why? Because you can't tell. If you decide some claims stay and some claims go, or if one of the two theories of damages aren't supported, neither of them are supported. Why did you waive that position by agreeing to the submission to the jury of a single damage verdict? We didn't, Judge. We objected to the submission of the evidence on both categories of damages. Did you object to the submission of the special verdict question? No, Judge. All right. We objected that there was insufficient evidence that both the going concern analysis didn't actually measure the company that existed. We objected that there was no deepening insolvency evidence. And when the judge let that go to the jury, if that evidence stands, that jury form isn't objectionable. But if you pull out one of the claims, or if you pull out either of the theory of damages that's not being supported by evidence, and neither of them are supported by a single piece of evidence, it's a big part of our brief. Counsel didn't get up here and say, let me explain to you what our evidence was that insolvency deepened. It's zero. There's error. There's none. What's the evidence that the going concern value became lower, was damaged? Zero. None. So we all know bad facts are bad facts, but it's the plaintiff's burden to then say, and here's how there's a direct causal but-for connection to the damages I'm asking for, and here there is none. There's none for deepening insolvency, and there's even less for the alleged mismanagement. The only mismanagement that's associated with a number is the receivables. If I could go to the punitives for a second. You have asked us to consider that net worth chart as part of the record on appeal, correct? Correct. You didn't present it to the trial jury. Why should we consider something that you now want us to consider, but you didn't present it to them? I know that burden of proof, but sometimes advocates decide, let me present this evidence so that I can show how the punitive damage award, if the run to be reached, should be as high. You obviously want us to consider it. Why didn't you ask the trial jury to consider it? It's in the record so you can see that that evidence would have made a difference. But there's my point. If it would have made a difference, you should have presented it to the jury. Why should this court look at something that you say should have made a difference? Why didn't you present it to the fact finder? The answer is that was not our burden. That was the plaintiff's burden to prove all the elements and present all the necessary evidence on punitive damages. It was their burden to present all the necessary evidence on deepening insolvency, which they did not do, and all the evidence that proved that whatever quantifiable amount of damages they had and they did not do. But then why are you asking us to consider it if it's their burden? You want us to consider something, say it would have mattered had they done it, but they didn't? I'm not sure why you're asking us to consider it. I think it matters that you consider it, Judge. Thank you. I understand your last answer. You don't think it matters? I think it's their burden, Your Honor, to have presented that. Okay. Thank you. All right. We thank counsel for their helpful arguments in this case, and we will take the matter under advisement. We call the next matter, which is United States of America.